# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
June 25, 2024 Session

## SHIRA SKOPP LEVY v. ALAN LOUIS LEVY

**Appeal from the Circuit Court for Shelby County**
**No. CT-1869-21      Mary L. Wagner, Judge**

———————————————————

### No. W2023-01124-COA-R3-CV

———————————————————

This appeal arises from a divorce action in which the issues on appeal principally concern the award of alimony *in futuro* and the allocation of the children's optional school or extracurricular expenses. Prior to trial, the parties agreed to a parenting schedule and that the husband would pay $4,100 per month in child support, but they did not agree on the wife's claim for alimony, the allocation of optional expenses for the children's school or extracurricular activities, or the division of the marital estate. Following a multi-day trial, the trial court divided the approximately $12 million marital estate equally between the parties and awarded the wife $2,000 a month in alimony *in futuro*. The award of alimony *in futuro* was based, in principal part, on the court's finding that the wife had an earning capacity of $160,000 a year—although the most the wife had ever earned was $80,000 a year—and that some of the wife's claimed monthly expenses were "overstated" or unsubstantiated. The court also allocated 20% of the children's optional expenses for school and extracurricular activities to the wife and 80% to the husband. The wife challenges the award of alimony *in futuro* and the allocation of the children's optional expenses, contending that the trial court "grossly overestimated" her earning capacity and erred by reducing her claimed expenses. Finding that the evidence preponderates against the trial court's determination of the wife's earning capacity, we vacate the award of alimony *in futuro* and the court's order that the wife pay 20% of the children's optional expenses for school or extracurricular activities, and remand both issues for further consideration. We affirm the trial court in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated in Part; Affirmed in Part; and Remanded**

Frank G. Clement, Jr., P.J., M.S., delivered the opinion of the court, in which J. Steven Stafford, P.J., W.S., and Kenny W. Armstrong, J., joined.

Donald Capparella, Nashville, Tennessee, for the appellant, Shira Skopp Levy.

Vickie Hardy Jones, Memphis, Tennessee, for the appellee, Alan Louis Levy.

## OPINION

### FACTS AND PROCEDURAL HISTORY

Shira Skopp Levy ("Wife") and Alan Louis Levy ("Husband") were married on June 19, 2005. During the almost 18-year marriage, the parties had three children together, twin sons, born in September 2008, and a daughter, born in November 2013 ("the Children"). At the time this case came on for trial in April 2023, Wife was 42 years old, Husband was 49 years old, and the Children were all minors.

Husband is a dermatologist and surgeon who works for Levy Dermatology, P.C. ("Levy Dermatology"), a successful medical practice that Husband founded in 2009 after the parties married. When Levy Dermatology opened, it had one office and four employees. By the time of trial, Levy Dermatology had grown to approximately seventy employees and four locations, two of which were housed in properties owned by MARS Enterprises, LLC ("MARS Enterprises").[1]

Wife began working part-time for Levy Dermatology in 2010, and by 2016, she had been named COO of the practice. During Wife's tenure at Levy Dermatology, she was involved in locating new offices for the practice and overseeing the build-out of those offices, as well as inventory, bookkeeping, and personnel, *inter alia*.

In October 2020, Husband and Wife separated; nevertheless, Wife continued to work at Levy Dermatology as its COO until December 2021, when she voluntarily resigned. Significantly, her position as COO was not filled after she left the practice.

On May 7, 2021, Wife filed a complaint for divorce against Husband, alleging grounds of irreconcilable differences and inappropriate marital conduct. In his answer, Husband admitted to the ground of irreconcilable differences but denied any inappropriate marital conduct, instead claiming that Wife was guilty of inappropriate marital conduct.[2]

The trial in this case took place over a period of eight non-consecutive days in April 2023. On May 4, 2023, the trial court entered the final decree of divorce, setting forth its findings of fact and conclusions of law in a 39-page order.

---

[1] MARS Enterprises is a single member LLC of which Husband is the sole member. However, it is undisputed that MARS Enterprises was marital property.

[2] Thereafter, both parties filed petitions for civil contempt against one another, which are not at issue in this appeal.

The court awarded Husband the divorce, finding that Wife was guilty of inappropriate marital conduct. Regarding parenting time and child support,[3] the court found that "[t]he parties have agreed to fifty-fifty parenting time and have been operating well under that schedule during the divorce proceedings" and that "[t]he parties agree that [Husband] shall pay to [Wife] the sum of $4,100 per month in child support." The court also ordered Husband to pay for the Children's private school tuition, which totaled $78,000 annually at the time of trial. The court noted that, while the parties agreed to "the major areas of the Permanent Parenting Plan," they did not agree on certain aspects, including the allocation of optional expenses for school or extracurricular activities.

The court found it "appropriate to divide any optional expenses for school or extracurricular activities 80/20, with [Husband] being responsible for 80% of any agreed upon expenses" and Wife being responsible for 20% of these expenses, stating that "[Wife] should have some financial responsibility for these expenses and does have the ability to contribute."

Turning to the division of the marital estate, the trial court valued the marital estate at approximately $12.4 million and divided the marital assets equally between the parties. Specifically, the court awarded Wife $6,197,327.44 in assets, which included the marital residence valued at $1.7 million, without any encumbrance, miscellaneous assets and accounts, and $2,950,000 in cash in the form of alimony in solido to be paid by Husband.[4] Husband was awarded an equal share of the marital estate, which included the residential property that Husband was living in during the divorce proceedings, valued at $1.15 million; Levy Dermatology,[5] valued at $6.1 million; and MARS Enterprises, valued at $1.93 million. The parties do not dispute the trial court's classification, valuation, or division of the marital estate.[6]

---

[3] In conjunction with the final decree of divorce, the trial court entered a permanent parenting plan which resolved most of the issues related to the care and support of the Children.

[4] The court directed Husband to pay Wife $700,000 of this amount within thirty days of the entry of the final order, and to pay the remaining amount "at the rate of $500,000 annually by February 1st of each year."

[5] The court found Levy Dermatology to be the parties' most significant asset. After considering the testimony of Karolina Calhoun ("Ms. Calhoun"), Wife's business valuation expert, and Mark Orndorff ("Mr. Orndorff"), Husband's business valuation expert, the court valued the practice at approximately $6.1 million, finding "Mr. Ordnorff's valuation to be an accurate depiction of the present value of Levy Dermatology." The court then awarded Husband all right, title and interest in and to Levy Dermatology and its assets, along with the two commercial properties owned by MARS Enterprises which it valued at $780,000 and $1.15 million, respectively.

[6] As to the personal property in the two residential properties, the court found that the parties had previously agreed to a division and that each party had since purchased additional furnishings. Therefore, the court ruled that "each [party] should receive those items in their possession and no value should be

In determining the nature, amount, and duration of alimony, the court first considered each party's earning capacity. The court imputed Husband's income at $273,195.54 per month, or $3.2 million per year. As for Wife, the court found that she was voluntarily underemployed, noting that she "works a few hours a week at $15 per hour" for a family friend despite having "skills far above this pay rate" and "the ability to work full time."[7] The court found that Wife had "made no efforts to find other employment since voluntarily resigning from Levy Dermatology as of December 31, 2021" and that she had presented no proof "as to any reason she could not be working."

After finding Wife to be voluntarily underemployed, the court noted that, in her most recent full-time role as COO of Levy Dermatology, Wife earned a salary of $80,503 per year, which had been set by her, along with various other benefits. The court then cited the testimony of Mr. Orndorff, who, as part of his valuation of Levy Dermatology, relied on Reasonable Compensation Reports[8] to opine that the normalized compensation for a COO in a comparable business would be $160,000 per year. Based on these findings, the court determined that Wife had an earning capacity of $160,000 per year.

The court next considered Wife's need. The court found that Wife's claimed need of $30,000 per month was "overstated in some regards." After reducing several of Wife's claimed monthly expenses, the court found her need to be "$15,155.38 per month after child support and before any income." The court then considered the twelve statutory alimony factors enumerated in Tennessee Code Annotated § 36-5-121(i) and made findings of fact as to each factor.

Based on all the above, the court awarded Wife transitional alimony in the amount of $16,000 a month for one year, so that she may "obtain full-time employment at her

---

assigned as no proof of value was presented." The court also held that each party should be responsible for their own credit card debts.

[7] With regard to Wife's education and professional background, the court found that

Wife has a Bachelor's degree from Florida State University in Business Administration with an emphasis on Risk Management and Insurance. She spent a semester studying International Business and Finance in France. She graduated with high honors. She also earned a Master's in Education from Christian Brothers University. . . . Previously she worked as C.O.O. for Levy Dermatology. She was an integral part of the growth of the business. She started out assisting with bookkeeping and payroll and her responsibilities grew. According to Mrs. Levy, it was her skills and ability that allowed the business to prosper. . . . Her role was significant, and by all accounts, she did it well.

[8] According to Mr. Orndorff's testimony, Reasonable Compensation Reports is a service relied upon by business appraisers which recommends a salary range, both nationally and locally, for certain positions in a company based on industry and location.

earning capacity." The court also awarded Wife alimony *in futuro* in the amount of $2,000 a month, finding that "she will still have a monthly deficit of just under $2,000 a month" after obtaining employment at her earning capacity.[9]

This appeal by Wife followed.

## ISSUES

Wife presents four issues on appeal, stated as follows:

I.   Whether the trial court abused its discretion by awarding Wife only $2,000 per month in alimony *in futuro*, where (1) there was no dispute as to Husband's ability to pay as he earned over $273,000 per month; and (2) the trial court made a clearly erroneous assessment of Wife's need by grossly over-estimating the amount of her earning capacity.

II.   Whether the trial court further committed an abuse of discretion by failing to apply the legal standard found in Tenn. Code Ann. § 36-5-121(c)(2) when measuring Wife's need for alimony.

III.   Whether the trial court also abused its discretion by arbitrarily reducing Wife's expenses when calculating her need for alimony *in futuro*.

IV.   Whether the trial court abused its discretion by requiring Wife to pay 20% of any optional expenses for school or extracurricular activities rather than allocating such expenses pro rata in accordance with the parties' incomes, given (1) the trial court's clearly erroneous assessment of Wife's earning capacity and need for alimony, and (2) the extreme disparity in the parties' incomes.[10]

Husband presents one issue on appeal, which we rephrase as follows: whether Husband is entitled to his attorney's fees and expenses in defending this appeal.

## STANDARD OF REVIEW

We review an award of alimony under the abuse of discretion standard. *Cain-Swope v. Swope*, 523 S.W.3d 79, 94 (Tenn. Ct. App. 2016); *Herrera v. Herrera*, 944 S.W.2d 379, 388 (Tenn. Ct. App. 1996). Appellate courts afford the trial court "broad discretion to

---

[9] The trial court also rejected both parties' petitions for civil contempt and both parties' requests for attorney's fees.

[10] Wife does not appeal the trial court's rulings related to the grounds for divorce, marital property, marital estate, contempt, or attorney's fees.

determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). The abuse of discretion standard does not permit reviewing courts to substitute their discretion for the trial court. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). Nevertheless, the abuse of discretion standard of review does not immunize a trial court's decision from any meaningful appellate scrutiny:

> [R]eviewing courts should review a [trial] court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions.

*Id.* at 524–25 (citations omitted).

When "[a]pplying this framework, we look first at whether the factual basis for the trial court's decision is supported by evidence in the record." *Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 306 (Tenn. 2020). We "review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d)." *Lee Med., Inc.*, 312 S.W.3d at 525. We then look at whether the trial court identified and applied the correct legal principles relevant to its decision. *See Harmon*, 594 S.W.3d at 306. Our review of the trial court's legal determinations is "de novo without any presumption of correctness." *Lee Med., Inc.*, 312 S.W.3d at 525. Finally, we look at "whether the [trial] court's decision was in the range of acceptable alternative dispositions." *Id.* When doing so, we are mindful of the inherent limitations in the abuse of discretion standard:

> [B]ecause, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen. Accordingly, if the reviewing court determines that reasonable minds can disagree with the propriety of the decision, the decision should be affirmed.

*Harmon*, 594 S.W.3d at 306 (quoting *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019)).

Determinations regarding child support are also reviewed under the abuse of discretion standard. *See State ex rel. Williams v. Woods*, 530 S.W.3d 129, 136 (Tenn. Ct. App. 2017); *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005).

## ANALYSIS

## I. ALIMONY

Wife challenges the award of alimony *in futuro* in the amount of $2,000 per month on three distinct grounds, as stated in her first three issues. Because these issues are interrelated, we shall discuss each of them in this section.

"[A] trial court's 'decision to award spousal support is factually driven and involves the careful balancing of multiple factors.'" *Ingram v. Ingram*, No. W2017-00640-COA-R3-CV, 2018 WL 2749633, at *2 (Tenn. Ct. App. June 7, 2018) (quoting *Parrish v. Parrish*, No. W2013-00316-COA-R3-CV, 2013 WL 3203352, at *5 (Tenn. Ct. App. June 21, 2013)). These factors include but are not limited to those enumerated in Tennessee Code Annotated § 36-5-121(i).[11] The two most important factors are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Williams v. Williams*, 286 S.W.3d 290, 295–96 (Tenn. Ct. App. 2008) (citations omitted). When considering these two

---

[11] The factors are:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
> (3) The duration of the marriage;
> (4) The age and mental condition of each party;
> (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
> (6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
> (7) The separate assets of each party, both real and personal, tangible and intangible;
> (8) The provisions made with regard to the marital property, as defined in § 36-4-121;
> (9) The standard of living of the parties established during the marriage;
> (10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
> (11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
> (12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i)(1)(1)–(12).

factors, the primary consideration is the disadvantaged spouse's need. *Chase v. Chase*, 670 S.W.3d 280, 289–90 (Tenn. Ct. App. 2022) (quoting *Murdock v. Murdock, No. W2019-00979-COA-R3-CV, 2022 WL 611024, at \*14 (Tenn. Ct. App. Mar. 2, 2022)*).

A.

Wife contends that the trial court "grossly overestimated" her earning capacity in making its award of alimony *in futuro* because "[she] had *never in her life* made more than the $80,503 she made as the COO of [Levy Dermatology]." Wife further claims that the trial court erred in relying upon the testimony of Husband's business valuation expert, Mr. Orndorff, in finding that her earning capacity was $160,000 a year when the scope of Mr. Orndorff's work was to value Levy Dermatology and the trial court explicitly found that he was not competent to testify regarding Wife's personal qualifications. For his part, Husband claims that the trial court "did not improperly rely on the testimony of the parties' business valuation experts in finding that Wife's earning capacity was $160,000 per year" because "Wife presented extensive proof concerning her education, skills, and contributions to Levy Dermatology."

The trial court based its finding of Wife's earning capacity, in principal part, on the opinion expressed by Mr. Orndorff. Although no "vocational" expert witness testified regarding Wife's earning capacity, Mr. Orndorff opined that "the industry standard salary for a C.O.O. is $160,000." However, and significantly, Mr. Orndorff did not give an opinion about what Wife could earn in the open market based on her talent, skills, training, and experience.

Relying principally on the opinion of Mr. Orndorff concerning the appropriate compensation for a COO in a medical practice like Levy Dermatology, the trial court imputed $160,000 in annual income to Wife, despite finding that she had never earned more than $80,000 a year while working for Husband's medical practice.

In setting the amount of alimony, "the court shall consider . . . [t]he relative earning capacity . . . of each party." Tenn. Code Ann. § 36-5-121(i), (i)(1). The determination of a party's potential income is a question of fact that requires careful consideration of all the attendant circumstances. *Pearson v. Pearson*, No. W2018-01188-COA-R3-CV, 2019 WL 2394247, at \*6 (Tenn. Ct. App. June 6, 2019) (citing *Bordes v. Bordes*, 358 S.W.3d 623, 630 (Tenn. Ct. App. 2011)).

Black's Law Dictionary defines earning capacity as "[a] person's ability or power to earn money, **given the person's talent, skills, training, and experience**." *See Earning Capacity*, Black's Law Dictionary (11th ed. 2019) (emphasis added). Determination of a party's earning capacity, therefore, requires consideration of the party's circumstances and qualifications, including their age, past and present employment, education and training, and ability to work. *See Gordon v. Gordon*, No. E2010-00392-COA-R3-CV, 2010 WL

4244345, at *5 (Tenn. Ct. App. Oct. 27, 2010) (finding that the wife had a significant earning capacity based on her "age, health, education, intelligence, skills, industrious nature, occupations and employment history."); *Small v. Small*, No. M2009-00248-COA-R3-CV, 2010 WL 334637, at *7 (Tenn. Ct. App. Jan. 28, 2010) (considering the wife's circumstances and personal qualifications in finding that she had an earning capacity of $65,000).

Tennessee courts have also routinely considered a party's previous earnings to determine their earning capacity. *See Bordes v. Bordes*, 358 S.W.3d 623, 630 (Tenn. Ct. App. 2011) ("Taking pre-divorce earnings into account is proper and consistent with the court's responsibility under Tenn. Code Ann. § 36-5-121(i) in determining an initial award of alimony."); *see also Brooks v. Brooks*, 992 S.W.2d 403, 407 (Tenn. 1999) (finding that the best evidence of the husband's earning capacity was the income he made prior to liquidating his business); *accord Small*, 2010 WL 334637, at *5.

Here, as stated above, the trial court principally relied upon the testimony of Mr. Orndorff in finding that Wife has an earning capacity of $160,000 per year. However, Mr. Orndorff did not base his opinion on an assessment of Wife's personal qualifications; instead, his opinion was based on data provided by industry Reasonable Compensation Reports, which he gathered in order to value Levy Dermatology.[12]

Furthermore, the trial court expressly found that neither expert was qualified to testify regarding Wife's personal qualifications, stating that: "While **Ms. Calhoun and Mr. Orndorff cannot opine as to Ms. Levy's personal qualifications**, they are qualified to testify to industry standard salaries as it is part of their valuation analysis." We also find it significant that Mr. Orndorff was qualified as an "expert[] in business evaluation" rather than a vocational expert.

Outside of the data provided by Reasonable Compensation Reports, which Mr. Orndorff appeared to exclusively rely upon in estimating "the industry standard salary for a C.O.O.," there is nothing in the record to indicate that Wife could earn $160,000 per year.

---

[12] In valuing Levy Dermatology, Mr. Orndorff employed the income approach, which he described as follows: "[T]he methodology there is to look at historical [pre-tax] income statement[s] over the [relevant] period of time and make any adjustments to those that you deem appropriate." Mr. Orndorff testified that he found it appropriate to adjust for CEO and COO compensation, charitable contributions, "the income from PPP loan forgiveness," "the exit of multiple providers from the practice," "legal and professional fees" from 2021 and 2022, property taxes, and federal income taxes for the 2017–2022 period. In adjusting for CEO compensation, Mr. Orndorff "ran [a Reasonable Compensation Report] for somebody that would be in [the CEO] role for Levy Dermatology providing the level of service that needs to be provided" and chose a number within the recommended range as the normalized compensation for a CEO position in a comparable medical practice. He also ran the same report for the COO position and found that the normalized compensation for that position would be $160,000 per year.

Rather, it is undisputed that Wife has never made more than $80,503 per year, which she earned while working as COO for Husband's medical practice for approximately five years. Moreover, that was her only employment during the parties' almost eighteen-year marriage. We also find it significant that the position of COO at Levy was not filled after Wife left the position, which indicates that Wife's services as COO were not essential to the practice.

For these reasons, we find that the evidence preponderates against the trial court's factual finding that Wife has an earning capacity of $160,000 per year.[13]

B.

Wife also contends that the trial court erred in reducing her proposed monthly expenses for therapy, charitable giving, cosmetics, clothing, and gas when calculating her need because "[a]ll of [her] expense estimates were taken from her actual spending history during her marriage." Wife further claims that the court erred in reducing her need by the amount she will be receiving from Husband in monthly child support because her affidavit "did not include [her] expenses for feeding [the Children], or for housing them, when they are in her custody."

For his part, Husband claims that the court's reductions were proper because Wife failed to present compelling evidence regarding her claimed expenses for charitable giving, therapy, gas, clothing, and cosmetic procedures. He also claims that the court properly considered his child support payments in calculating Wife's need because her Rule 14(c) affidavit "included city and county property taxes, food and clothing expense[s] for the children" and "there was no proof that Wife has incurred or would incur any expenses for the children not listed on her affidavit."

---

[13] As noted in *Lee Medical, Inc. v. Beecher*:

> [R]eviewing courts should review a [trial] court's discretionary decision to determine (1) **whether the factual basis for the decision is properly supported by evidence in the record**, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions. **When called upon to review a [trial] court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d)** and should review the [trial] court's legal determinations de novo without any presumption of correctness.

312 S.W.3d at 524–25 (citations omitted) (emphasis added). When "[a]pplying this framework, we look first at whether the factual basis for the trial court's decision is supported by evidence in the record." *Harmon*, 594 S.W.3d at 306.

- 10 -

Wife claims to have a need of $29,488.71 per month in support. The trial court found that some of Wife's claimed monthly expenses were "overstated" or unsubstantiated, cutting $2,950 in expenses from her claim of need. The court also eliminated $7,283.33 in claimed expenses for the Children, reducing Wife's claimed need to $19,255.38 per month. It further reduced Wife's claimed need by $4,100 per month, the amount of child support that Husband was required to pay. As a result, the trial court found that Wife had a "total need of $15,155.38 per month after child support and before any income."

Specifically, the trial court made the following factual findings regarding Wife's proposed monthly expenses as listed in her Rule 14(c) affidavit:

> While the parties' standard of living is high, the Court finds Mrs. Levy's expenses to be overstated in some regards. First, no explanation for the expense of $500 a month in gas was provided. The proof shows that Mrs. Levy lives within close proximity to the children's school and does not currently have full-time employment. The Court believes this should be reduced to $250 a month. Further, there was no testimony that Mrs. Levy is currently in therapy or the cost of any such therapy. Therefore, the Court finds this amount should be removed. Mrs. Levy requests $2,000 a month in clothing just for herself. There was no explanation as to why she would need this amount of new clothing per month, especially while not working. The Court reduces this to $1,000 a month. Mrs. Levy testified that she received $1,000 in cosmetics a month from Levy Dermatology. No other explanation was provided as to what services or products were provided or their cost. The Court does not find this number as an ongoing expense credible. The Court reduces this to $500 per month. Mrs. Levy includes a request for $500 a month for charity. There was no proof that the parties—outside the business—regularly gave to charity. The Court removes this expense. Mrs. Levy also includes the full expenses for the children, most of which Dr. Levy will be paying. The Court removes the private school tuition as this will be paid by Dr. Levy. The Court also reduces to 20% the orthodontist/dentist, extracurricular, and medical to reflect the amount that Mrs. Levy will pay in the future. The Court also reduces the children's clothing to $500 per month. These modifications result in a total need of $19,255.98 per month before child support. Child support will be $4,100 per month. Therefore, Mrs. Levy's total need is $15,155.38 per month after child support and before any income.

Having reviewed the record, we find that the evidence does not preponderate against the trial court's findings of fact set forth above.

Regarding Wife's proposed therapy expenses, Wife did not testify that she was seeing a therapist at the time of trial or in the year preceding the trial. Moreover, the only

- 11 -

evidence of the amount of Wife's claimed therapy expenses is found among over a hundred pages of bank and credit card statements, which Wife introduced into evidence in bulk without directing the court to relevant evidence. As stated by the trial court, "I don't need any more bank statements that you insist upon giving me. I'm just wondering if you're going to want me to dig through those to find all of these things myself because that's the phrase from the Court of Appeals, pigs hunting for truffles."[14] Moreover, there is no evidence in the record to support a finding that Wife needed to continue therapy or that the expenses she claims on appeal are reasonable.

As for Wife's claimed charitable donations, Wife failed to establish that she was giving to charities in the amounts and with the frequency she claims on appeal. At trial, Wife testified that the parties donated $5,000 to the University of Memphis "two years ago" and that they had given an unspecified amount to St. Jude "the year before." Simply put, this testimony is not sufficient to prove that Wife routinely donates an average of $500 a month to charities.

As to Wife's proposed expenses for cosmetic services, Wife provided little proof of the cost of these services or the types of services she claims on appeal. Additionally, as noted above, the trial court found that "this number as an ongoing expense" was not credible. "When issues of credibility and weight of testimony are involved, we afford considerable deference to the trial court's findings of fact." *Larsen-Ball v. Ball*, 301 S.W.3d 228, 235 (Tenn. 2010) (citing *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007)). Wife similarly failed to establish a need of $2,000 a month for clothing or $500 a month for gas.

We also find no error with the trial court's reduction of Wife's total need by $4,100 a month, which is the amount that Husband will be paying her in child support. Under the Tennessee Child Support Guidelines ("the Guidelines"), expenses for housing, food, clothing, and transportation are "child rearing expenses" that are factored into the obligor spouse's child support payment. *See* Tenn. Comp. R. & Regs. 1240-02-04-.03(4)(b)(5) (stating that a parent's basic child support obligation includes "an average amount to cover expenses for . . . . housing, food, and transportation" and "clothing and entertainment"). Accordingly, we conclude that the trial court did not err in reducing Wife's need by the amount that she will be receiving from Husband in monthly child support. *See Scherzer v. Scherzer*, No. M2017-00635-COA-R3-CV, 2018 WL 2371749, at *16 (Tenn. Ct. App. May 24, 2018) ("[C]hild support income should be considered in conjunction with all of Wife's financial assets when determining Wife's need for alimony." (citations omitted)).

---

[14] The trial court may have been referencing the following quote from this court, "[j]udges are not like pigs, hunting for truffles buried in' the record." *Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

Based on the foregoing, we find no error with the trial court reducing Wife's monthly expenses and considering Husband's monthly child support payment when calculating her need for alimony.

Because the trial court's alimony *in futuro* award of $2,000 a month was based, in principal part, on the trial court's determination that Wife had an earning capacity of $160,000 per year, and we have found that the evidence preponderates against that finding, we vacate the award of alimony *in futuro* and remand for the trial court to reconsider Wife's earning capacity and, after considering all relevant statutory factors, to enter an award of alimony *in futuro* in the amount and for the duration that the trial court deems appropriate.

C.

Wife also claims that, in determining her need, the trial court failed to consider "what level of alimony would be necessary to allow [her] to maintain a standard of living 'reasonably comparable' to the standard of living enjoyed by the parties during the marriage, or 'reasonably comparable' to the standard of living expected to be enjoyed by her ex-husband after the divorce." Husband contends that, in determining Wife's alimony award, "the trial court considered the relevant factors found in Tenn. Code Ann. § 36-5-121(i) [and] made factual findings supported by the testimony and other evidence in the record."

The record reveals that, in its assessment of Tennessee Code Annotated § 36-5-121(i) factor (9), the trial court made the following findings of fact regarding the parties' standard of living during the marriage:

> These parties have enjoyed a standard of living of which most only dream. They have lived a life of luxury. They shop at high-end stores. Their vacations typically cost between $10,000 and $20,000 a trip. Their children attend prestigious private schools. They often eat out. They live in million-dollar homes and live an equivalent lifestyle.

As noted above, we have vacated the trial court's award of alimony *in futuro* and have remanded the issue for further consideration. On remand, we are confident that the trial court will consider the directive in Tennessee Code Annotated § 36-5-121(c)(2) as well as factor (9) in § 36-5-121(i), along with all other relevant statutory factors when revisiting the alimony *in futuro* issue. Therefore, it is not necessary for this court to analyze this issue at this time.

## II. CHILD SUPPORT—OPTIONAL CHILDREN'S EXPENSES

Wife contends that the trial court erred in ordering her to pay 20% of any optional expenses for the Children's school or extracurricular activities, claiming that the court

- 13 -

overestimated her earning capacity and that there is an "extreme disparity in the parties' incomes." Husband counters that the court's apportionment of the Children's optional expenses between the parties was "proper under the circumstances of this case" because it will incentivize "both parents to exercise reasonable judgment in incurring such expenses."

As mentioned previously, Husband was ordered to pay all of the Children's private school tuition, which totaled $78,000 annually at the time of trial, along with 80% of the Children's optional educational and extracurricular expenses. In finding that Wife should be responsible for 20% of the Children's optional educational and extracurricular expenses, the court opined that Wife "has the ability to contribute" to these expenses. However, Wife's ability to contribute financially to these costs is based, in part, on her earning capacity. *See Barnett v. Barnett*, 27 S.W.3d 904, 909 (Tenn. 2000), 27 S.W.3d at 909 (holding that the cost of extraordinary expenses should be allocated "equitably among the parties" based on the "long-established common law rule requiring a parent to provide support 'in a manner commensurate with his means and station in life'" (quoting *Nash v. Mulle*, 846 S.W.2d 803, 805 (Tenn. 1993))); *see also* Tenn. Comp. R. & Regs. 1240-02-07-.07(2)(d) ("These expenses may be, but are not required to be, divided between the parents according to each parent's [percentage of income].").

We have determined that the evidence preponderates against the trial court's finding that Wife has an earning capacity of $160,000 a year. Because the Children's optional educational and extracurricular expenses may but are not required to be divided between the parents according to each parent's percentage of income, *see* Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d), we find it appropriate to vacate this award and remand the issue to afford the trial court the opportunity to reconsider the allocation of the Children's optional expenses. *See Kaplan v. Bugalla*, No. M2006-WL-02413, 2007 WL 4117787, at *8 (Tenn. Ct. App. Nov. 16, 2007) ("Because the trial court's allocation of 78% of the children's tuition to Mr. Bugalla was based, at least in part, upon the erroneous imputation of $29,339 in monthly income, we also reverse this portion of the trial court's Order.").

Our decision to afford the trial court the opportunity to reconsider this award, however, should not be construed as a directive to modify the allocation. We merely afford the trial court the opportunity to reconsider the issue after reconsidering Wife's earning capacity and all other relevant factors. *See* Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d); *see also Kaplan*, 2007 WL 4117787, at *8.

### III. ATTORNEY'S FEES ON APPEAL

Husband requests that he be awarded his attorney's fees and expenses incurred in defending this appeal pursuant to Tennessee Code Annotated § 36-5-103(c), which provides as follows:

A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the non-prevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

Because we have found Wife to be the substantially prevailing party on appeal, we decline to exercise our discretion to award Husband his appellate attorney's fees. *See Wilson v. Wilson*, No. M2023-01026-COA-R3-CV, 2024 WL 1577423, at *4 (Tenn. Ct. App. Apr. 11, 2024) (noting that a party need not obtain complete success on the merits of his or her claim to be considered a prevailing party for purposes of an award of attorney's fees (citing *Buckley v. Carlock*, 652 S.W.3d 432, 445 (Tenn. Ct. App. 2022))).

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is vacated in part and affirmed in part, and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against the appellee, Alan Louis Levy.

_____
FRANK G. CLEMENT JR., P.J., M.S.